Filed 4/1/26  In re Stephen O. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re STEPHEN O., a Person Coming Under the Juvenile Court Law. | D085670 |
| THE PEOPLE, Plaintiff and Respondent, v. STEPHEN O., A Minor, Defendant and Appellant. | (Super. Ct. No. J243624) |

APPEAL from a judgment of the Superior Court of San Diego County, Tilisha T. Martin, Judge.  Affirmed.

Elisabeth R. Cannon, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Steve Oetting and Eric Tran, Deputy Attorneys General, for Plaintiff and Respondent.

The People filed a juvenile wardship petition against Stephen O., then 17 years old, in connection with an alleged murder. Proposing to try him as an adult, the People moved to transfer his case to criminal court. The juvenile court granted the People's motion after finding clear and convincing evidence that Stephen would not be amenable to rehabilitation before he turned 25 years old, when its jurisdiction over him would end.

Stephen, now nearly 21 years old, requests that we return his case to juvenile court. He claims the judge erred as a matter of law in granting the People's motion because they did not call any expert witness to opine as to whether he could be rehabilitated before the juvenile court's jurisdiction expired. Further, Stephen argues, the judge should have found that the mitigating evidence supported the juvenile court retaining jurisdiction over his case.

We review the transfer order for abuse of discretion and its underlying findings of fact for substantial evidence. There is no inflexible requirement that the People always support their motion with expert testimony, and the record shows that the trial court considered all the evidence presented when making its factual findings. Absent insufficient evidence for these findings, an error of law in the court's analysis, or arbitrariness in the court's decision, we must defer to the court's conclusion that transferring Stephen's case was appropriate. Having identified no such deficiencies, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    *Charged Offenses*[1]

Around 9:30 a.m. on October 5, 2022, the San Diego Police Department received a 911 call about a shooting in a residential neighborhood of the Mira Mesa community.  Officers found a male victim of multiple gunshot wounds lying in the street in front of his house where he lived with his family.  He was pronounced dead at the scene.

Police first linked Nicholas Forehand to the shooting based on videos of his car fleeing the scene.  The day after the shooting, Forehand and his lone male passenger, I. Rodriguez, were arrested during a traffic stop.  While the men were in a holding cell, Forehand made comments to Rodriguez that appeared to relate to the killing.  Among them was that they should have told "Daps"—who investigators later learned was Stephen's moniker within the Asian Crips gang—to leave.  That same night, the police discovered Stephen in Forehand's apartment when they arrived to execute a search warrant.

Investigators found messages in Rodriguez's, Forehand's, and Stephen's social media accounts that appeared to be related to the killing.  Early in the morning of the murder, Forehand messaged Stephen asking for gas money so he could pick him up.  At 7:44 a.m., Stephen asked Forehand, "U wanna pick me up [right now]?"  Forehand replied that it would take him about 40 minutes to get to Stephen's house in the City of Poway.

---

[1]    We derive the facts mainly from the report of Stephen's behavioral patterns and social history (transfer report) prepared by the probation officer (PO) after the People filed their transfer motion.  The juvenile court must assume the youth committed the charged offense when deciding whether to transfer his or her case to a court of criminal jurisdiction.  (*People v. Superior Court* (*Jones*) (1998) 18 Cal.4th 676, 682.)

3

At 7:51 a.m., Rodriguez messaged someone that "Nic just got here, but he finna get daps rn, lol."

Forehand arrived at Stephen's house at 8:42 a.m. Stephen's phone left his house a few minutes later, arrived at the scene of the shooting at 9:24 a.m., and then traveled to Forehand's apartment. After being arrested on suspicion of committing this murder, Forehand spoke to undercover operatives disguised as inmates in his jail holding cell. He told them that he drove to Stephen's house the morning of the killing, picked him up, drove him to the victim's house, and watched him get of the car and shoot the victim to settle a "personal beef."[2]

The source of this disagreement, investigators believe, was gang related. In 2018, when Stephen lived in Mira Mesa, he joined a gang that the victim had started in their neighborhood. When Stephen was 14 years old, which would have been in either 2019 or 2020, he was "jumped in" to the rival Asian Crips gang. Rodriguez appeared to be a leader within the Asian Crips, whereas Stephen was a "soldier" who, at times, also suggested to Rodriguez how he should recruit new members. Stephen's phone contained what appeared to be rap lyrics written after the shooting, which described it as having been committed on behalf of the Asian Crips. According to Forehand, the shooting was Stephen's initiation into the gang.

In January 2023, Stephen was charged with murder (Pen. Code, § 187, subd. (a)) in a juvenile wardship petition filed by the People under Welfare and Institutions Code section 602[3] (murder petition). The People also alleged

---

[2]    Forehand is appealing his July 2023 conviction as an aider and abettor of first degree murder for his role in the killing.

[3]    Subsequent undesignated statutory references are to the Welfare and Institutions Code.

4

that Stephen personally discharged a firearm causing great bodily injury and death to the victim (Pen. Code, § 12022.53, subd. (d)).

## B.     *Stephen's Prior Delinquency History*

Stephen has been involved in the juvenile justice system since he was 14 years old.  In December 2019, he stole four flavored cigarettes from a convenience store.  Sheriff's deputies offered him the opportunity to address the matter through diversion, but he refused over his parents' objection.  In March 2020, deputies were called to Stephen's high school because he was under the influence of Xanax.

In November 2020, the district attorney filed the first juvenile wardship petition against Stephen, charging him with the misdemeanors of petty theft and public intoxication (theft petition).  The juvenile court allowed Stephen to complete a program of informal supervision in lieu of commencing delinquency proceedings.  His supervision conditions included abiding by a curfew, regularly attending school, leaving his home only with permission, completing antitheft and seeking safety courses, and submitting to random drug testing.

In May 2021, the probation department learned Stephen had been involved in a fight at school that resulted in a three-day suspension.  His conditions of supervision were amended to include a requirement that he undergo individual therapy through the Substance Abuse Services program.  Stephen started therapy in July, but stopped going at some point when he left home without permission, something the probation department learned happened frequently, often for days or weeks at a time.  During Stephen's time in therapy, he tested positive for drugs twice—both times for marijuana.

The juvenile court scheduled a review hearing in October 2021 on Stephen's progress on informal supervision.  Delinquency proceedings were

reinstated and a bench warrant issued after he failed to appear for this review. Stephen turned himself in, claiming that he had been living away from home and had forgotten about the hearing. After admitting to both counts alleged in the theft petition, Stephen was adjudged a ward of the court in December 2021 and placed on probation. The conditions of Stephen's probation included to abide by a curfew; not to use, sell, or possess drugs; and to submit to drug testing.

In January 2022, Stephen was again referred to the Substance Abuse Services program, which he again failed to complete. About six weeks later, he was referred to the Mobile Adolescent Services Team—which provides services to children identified as having serious emotional disturbances— after he expressed feelings of anxiety and restlessness. It appears he stopped participating in this program before counselors could schedule a session his parents were also able to attend.

Stephen reported to the probation department in March 2022 that he had taken his mother's car without her permission and crashed it. As a consequence, he was referred to yet another program—CHOICE—which provides "high-risk youth on probation" with "intensive support through daily contact to encourage positive decision-making and fulfillment of court orders and probation case planning goals."

In May 2022, while Stephen was still on probation for his theft and intoxication offenses, police stopped him and found in his possession a white powdery substance divided into several small plastic baggies, a bottle containing another baggie of white powder and 55 Xanax pills, two containers of marijuana, and a loaded firearm that had been reported stolen out of Los Angeles. The district attorney filed a second juvenile wardship petition charging Stephen with felony possession of cocaine while carrying a loaded

6

firearm, felony unlawful possession of a concealable firearm without permission of his parent and while not accompanied by his parent, felony possession of Xanax for sale, and misdemeanor firearm-related offenses and possession of cocaine (the drug petition). It also alleged that Stephen's commission of these offenses violated the terms of his probation.

The juvenile court adjudged Stephen a ward of the court after he pleaded guilty to the felony drug and gun charge and a misdemeanor charge of carrying a loaded firearm in public. The remaining counts were dismissed. He stated in a later message to Rodriguez, "I said I was using all da drugs I had on me . . . gotta act like that when it hits the fan."

Stephen was sentenced to a commitment of no more than 130 days at Urban Camp to be followed by probation. He served the custodial part of his sentence from the middle of June to the beginning of September 2022. During that period, Stephen took part in high risk substance abuse counseling groups, individual therapy, and anger management. But he was also involved in several gang-related fights due to his claimed membership in the Asian Crips.

The conditions of Stephen's probation included a prohibition against leaving home without permission and a requirement that he complete the inpatient McAlister drug detoxification program. In November 2022, he returned to juvenile court to answer for the violations of two probation conditions: failing to complete the McAlister program and for leaving home several times without permission. Stephen entered the detoxification program about three weeks after his release from Urban Camp but was

7

kicked out after only seven days for, among other infractions, writing "Asian Crips" on the wall of his room.[4]

The probation department recommended that Stephen be placed with his father while waiting for another spot to open up in the McAlister program. The court instead remanded Stephen into custody until he could be reaccepted into the program. Stephen successfully completed the program on his second try.

Stephen has been in custody pending resolution of the murder petition since January 2023. In the two years between being detained and the hearing on the People's transfer motion, Stephen earned his high school diploma and took some college courses. He also participated in programs for career development, creative expression, self-control, trauma-informed cognitive behavioral therapy narrative, and forward-thinking responsible behavior.

Despite these interventions, Stephen was involved in several altercations, including at least three gang-related fights, the most recent of which occurred in September 2024. He has also shown a lack of respect for authority. For example, in response to a command from an officer to go to his room, Stephen called him a racial slur and said, "fuck you, I have been here longer than you." After the command was repeated, he responded, "I don't give a fuck, [I'm] Asian Crip." As another example, a few months later, he squared up to a different officer and said, "I'll beat your ass, go back to your country."

---

[4]    About a week after leaving the program, Stephen allegedly committed the killing at issue here.

8

## C.     *Motion to Transfer*

### 1.     *Statutory Framework*

"A juvenile court can retain jurisdiction over a minor . . . for the offense of murder until he or she attains 25 years of age, or upon the expiration of a two-year period of control, whichever occurs later." (*In re J.S.* (2024) 105 Cal.App.5th 205, 213 (*J.S.*).) The People may move to transfer the case of such a minor aged 16 years or older to criminal court. (§ 707, subds. (a)(1) & (b)(1).[5]) The baseline term for a murder conviction by the juvenile court is between four and seven years (Cal. Rules of Court, rule 5.806(d)), whereas a person convicted of first degree murder in criminal court is subject to a minimum sentence of 25 years to life (Pen. Code, § 190, subd. (a)).

Upon the filing of a transfer motion, the juvenile court must order the probation department to prepare and submit a transfer report that describes "the behavioral patterns and social history of the minor." (§ 707(a)(1).) This report must discuss specified criteria and recommend whether the juvenile's case should be transferred. (Cal. Rules of Court, rule 5.768(a) & (b).) Based on the contents of the transfer report "and any other relevant evidence that the petitioner or the minor may wish to submit, the juvenile court shall decide" the motion. (§ 707(a)(3).) If the court orders a transfer of jurisdiction, it "shall recite the basis for its decision in an order entered upon the minutes, which shall include the reasons supporting the court's finding that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (*Ibid.*)

The minor's case will be transferred to criminal court only if the People prove by "clear and convincing evidence that the minor is not amenable to

---

[5]     For brevity, we omit the word "subdivision" when referring to any subdivision of section 707.

9

rehabilitation while under the jurisdiction of the juvenile court."
(§ 707(a)(1)(3); see Cal. Rules of Court, rule 5.770(a).) In making this determination, the juvenile court must consider five criteria: (1) the "degree of criminal sophistication exhibited by the minor"; (2) whether "the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction"[6]; (3) the "minor's previous delinquent history"; (4) success of "previous attempts by the juvenile court to rehabilitate the minor"; and (5) the "circumstances and gravity of the offense alleged in the petition to have been committed by the minor." (§ 707(a)(3)(A)(i)–(E)(iii).) Each criterion is followed by a nonexclusive list of factors for the court to consider. (*Ibid.*)

2. *The Trial Court's Decision*

Over the course of 10 days in late January and early February 2025, San Diego Superior Court Judge Tilisha T. Martin received testimony on the People's transfer motion from numerous witnesses: the PO who wrote the transfer report recommending that Stephen's case be moved to criminal court; Stephen's parents and other family members; defense expert and clinical and forensic psychologist Dr. Kristina Malek, who wrote a report recommending that Stephen's case remain in juvenile court; the director of the programming for the Youth Development Academy (YDA), where Stephen would be committed were to be adjudged a ward under the murder petition; and Stephen's recent therapists, educators, counselors, and mentors. The

---

[6] Although this criterion sounds similar to the overall assessment the juvenile court must make, the former is limited to whether there is " 'insufficient time to rehabilitate the minor' " whereas the latter "concerns a global assessment of the minor's suitability to rehabilitated within the juvenile court system, and not just a comparison of the time needed with the time remaining." (*In re Miguel R.* (2024) 100 Cal.App.5th 152, 167 (*Miguel R.*).)

court also judicially noticed Stephen's court file and considered the documents submitted by the parties.

The juvenile court granted the People's motion for the reasons stated in an oral ruling spanning 35 pages of the reporter's transcript. The judge found that each section 707(a)(3) criterion favored transferring Stephen's case and that the People proved by clear and convincing evidence that he was not amenable to rehabilitation within the jurisdiction of the juvenile court. Steven immediately appealed.[7]

## DISCUSSION

Stephen's broad-based attack on the transfer order starts with an assertion that the juvenile court erred as a matter of law because it reached the ultimate conclusion that he was not amenable to rehabilitation without the benefit of testimony by an expert witness for the People. Were that claim to fail, he asserts there was insufficient evidence for the juvenile court's findings that each section 707(a)(3) criterion supported the transfer motion because the judge failed to properly consider the mitigating evidence. The People respond that the PO gave expert testimony and that Stephen's substantive challenges to the order amount to a request that we reweigh the evidence, in contravention of the standard of review.

Resolving these issues requires us to examine the juvenile court's order for abuse of discretion. (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 165.) The court's " 'findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious.' " (*Ibid.*) Under this standard, "we do not reweigh the evidence and we do not substitute our discretion for

---

[7] This order is appealable within 30 days and "may not be heard on appeal from the judgment of conviction." (§ 801, subd. (a).)

11

the discretion exercised by the trial court." (*J.S.*, *supra*, 105 Cal.App.5th at p. 211.) Rather, we ask whether "any reasonable trier of fact" could make the challenged finding under the corresponding standard of proof, which in this case is clear and convincing evidence.[8] (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005 (*O.B.*).) This heightened standard of proof "reinforc[es] the important policy of maintaining youth offenders in the juvenile court system when the evidence of their resistance to rehabilitation is less than clear and convincing." (*In re O.F.* (Mar. 13, 2026, A166528) __ Cal.App.5th ___, ___ (*O.F.*) [2026 WL 708930, at p. *16].)

## A.    *Requirement for Expert Testimony From the People*

Citing *J.N. v. Superior Court* (2018) 23 Cal.App.5th 706 (*J.N.*) and pointing out that People did not call an expert witness, Stephen argues that we must reverse the transfer order because, as a rule, "[a] juvenile court abuses its discretion when the record lacks expert testimony indicating that the juvenile is not amenable to rehabilitation,[9] even when the record contains a probation report that so concludes." The People recognize that expert testimony on a transfer motion is "often important," but do not agree that such testimony is needed. In any event, they contend that the PO who wrote the transfer report provided expert testimony on their behalf.

---

[8]    Stephen suggests that the court's finding on each individual section 707(a)(3) criterion must be supported by clear and convincing evidence. Section 707(a)(3), however, requires courts to apply this heightened standard of proof only to the ultimate conclusion that the youth is not amenable to rehabilitation. (Accord *Miguel R.*, *supra*, 100 Cal.App.5th at p. 165 [applying this approach].) In any event, the juvenile court expressly stated that clear and convincing evidence supported its findings on four of the five criteria.

[9]    Stephen refers to the ultimate question of amenability to rehabilitation, not the section 707(a)(3)(B)(i) criterion.

12

We start with the language of the statute.  As noted, section 707(a)(2) requires the PO to provide a transfer report that, among other things, makes a recommendation on the transfer motion.  Upon receipt of that report, "and any other relevant evidence that the petitioner or minor *may wish to submit*," the court will decide the motion.  (§ 707(a)(3), italics added.)  This permissive language suggests that as a statutory matter, the People were not inevitably *required* to provide expert testimony.

The cases Stephen cites do not support his proposed bright-line rule.  During the hearing on a transfer motion in *J.N.*, *supra*, 23 Cal.App.5th at p. 706, the PO opined that the minor was not amenable to rehabilitation by the juvenile court even though "[t]here was no evidence as to the efforts necessary to rehabilitate J.N. and no evidence as to why available programs were unlikely to result in rehabilitation in the time allotted."  (*Id.* at pp. 714, 722.).  The panel explained that "[t]his lack of evidence rendered any opinion based on the report without evidentiary value."  (*Id.* at p. 722.)  It went on to fault the People for not "present[ing] any expert testimony concerning the programs available, the duration of any of the programs, or whether attendance would rehabilitate J.N. before termination of the juvenile court's jurisdiction."  (*Ibid.*)

The *J.N.* panel cited *Jimmy H. v. Superior Court* (1970) 3 Cal.3d 709 to support its rationale.  There, the Supreme Court explained if the time required for rehabilitation "is the determinative factor in the court's decision . . . there must be substantial evidence in the record that successful treatment might require the extra time."  (*Id.* at p. 715.)  But the high court also observed that expert testimony was not the only means to provide such evidence, explaining that courts "may consider a minor's past record of delinquency . . . and *[m]ust* take into account his behavior pattern as

13

described in the PO's report," factors about which an expert witness may provide guidance. (*Id.* at p. 714.) The reason the evidence was insufficient in *J.N.* is because there was nothing else in the record to corroborate the PO's conclusion that the minor was unlikely to be rehabilitated in the juvenile system. (*J.N.*, *supra*, 23 Cal.App.5th at pp. 721–722.)

*In re S.S.* (2023) 89 Cal.App.5th 1277, 1286 (*S.S.*), on which Stephen also relies, is in accord. In the portion of the opinion Stephen cites, the court posited that "expert testimony will *likely* be necessary for a complete analysis" as to whether a minor would be amenable to rehabilitation by the juvenile court. (*Id.* at p. 1287, italics added; accord, *O.F., supra*, __ Cal.App.5th at p. ___ [2026 WL 708930, at *18].) Relying on *J.N.*, the *S.S.* panel stated that a "proper analysis" of this question "*generally* requires 'expert testimony concerning the programs available, the duration of any of the programs, or whether attendance would rehabilitate [the minor] before termination of the juvenile court's jurisdiction.' " (*S.S.*, at p. 1291, italics added.) As was the case in *J.N.*, the prosecution "presented no evidence to demonstrate what minor's rehabilitative needs were, much less why they could not be met within the juvenile court's jurisdiction." (*S.S.*, at p. 1291.) Absent this evidence, the juvenile court's conclusion that S.S. could not be rehabilitated before its jurisdiction was lost was an abuse of discretion. (*Ibid.*)

We read these cases as standing for the principle that expert testimony can be used to fill a gap in the evidence supporting a PO's recommendation that a minor's case be transferred to criminal court. But here there was no gap. The PO thoroughly discussed Stephen's history, his reluctance to give up "his delinquent and gang lifestyle," and his "lack of implementation of skills learned through the intervention services provided to him while in

14

custody" on the murder petition. Based on these observations, the PO concluded there would not be "sufficient time in the juvenile court's jurisdiction to provide adequate rehabilitation." And as discussed below, this conclusion was informed by the PO's understanding of what programs would be available to Stephen through the YDA.

While we recognize that the juvenile court will often benefit from expert testimony offered by the People, the law does not mandate it either as a general rule or in this specific case.[10]

## B. *Sufficiency of the Evidence*

### 1. *Criminal Sophistication and Gravity of the Offense*

The juvenile court was required to examine Stephen's degree of criminal sophistication (§ 707(a)(3)(A)(i)) by looking at " 'the whole picture, that is, all the evidence that might bear on [his] criminal sophistication, including any . . . manifested in the present crime.' "[11] (*Kevin P. v. Superior Court* (2020) 57 Cal.App.5th 173, 192 (*Kevin P.*).) As for "the circumstances and gravity of the offense alleged in the petition to have been committed by" Stephen (§ 707(a)(3)(E)(i), the judge was to take into account "any relevant factor, including, but not limited to, the actual behavior of the person, the mental state of the person, the person's degree of involvement in the crime,

---

[10]    We therefore need not address the People's argument that the PO provided expert testimony.

[11]    Accord section 707(a)(3)(A)(ii) ("the juvenile court may give weight to any relevant factor, including, but not limited to, the minor's age, maturity, intellectual capacity, and physical, mental, and emotional health at the time of the alleged offense, the minor's impetuosity or failure to appreciate risks and consequences of criminal behavior; the effect of familial, adult, or peer pressure on the minor's actions; and the effect of the minor's family and community environment and childhood trauma on the minor's criminal sophistication").

15

the level of harm actually caused by the person, and the person's mental and emotional development."[12] (§ 707(a)(3)(E)(ii).)

Judge Martin considered these criteria together after concluding that they involved overlapping facts. Substantial evidence supports her findings that both criteria weighed in favor of transferring Stephen's case.

Stephen's criminal sophistication, the juvenile court believed, was "evidence[d] in part from the instant offense" and "by his conduct while detained and . . . while on probation in the community." The judge observed that the severity of Stephen's criminal misconduct had escalated from minor misdemeanor offenses to murder, with the latter occurring just a month after his release from Urban Camp and the intensive programming he had received there. As for the alleged murder itself, Judge Martin concluded that the method of its commission and Stephen's conduct beforehand and afterward showed that he intentionally killed the victim to gain status within the Asian Crips gang. Nothing suggested to the court that this "was an impulsive act[,] that Stephen was acting in self-defense," or that, as Dr. Malek opined, his actions were the result of significant peer pressure from adult gang members. Stephen's involvement in gangs for three years prior to the alleged offense, his long history of criminal behavior, and his role helping to recruit new gang members led the court to conclude that he had the emotional and mental wherewithal to appreciate the risks and consequences of committing the alleged offense.

Turning to the criterion of the gravity and circumstances of the alleged murder, Judge Martin incorporated the previous analysis and further observed that the victim's family members were "affected psychologically,

---

[12] The court should also consider any evidence indicating the victim trafficked, sexually abused, or sexually battered Stephen. (§ 707(a)(3)(E)(iii).) No such evidence was produced in this case.

16

suffering from grief and loss and suicidal ideations and adjusting to life without their loved one." She recounted that the victim's mother was hospitalized based on the shock of the loss of her son and has since moved from her home "so she does not have to wake up each morning to see the place where she saw her son . . . lying dead on the street."

The court also discussed at length the mitigating evidence put on by Stephen, some of which was provided by Dr. Malek. The judge acknowledged Stephen's age and that, while in custody under the current wardship petition, he earned his high school diploma, took some college classes, and participated in behavioral programming. She also took note of evidence that Stephen claimed to have started using drugs and alcohol in middle school, that his parents separated when he was three years old, and that he expressed resentment about the fact that his mother traveled to the Philippines for 45 days each year. Recognizing that these negative experiences "may have contributed to Stephen's personality and his functioning and emotional well-being," and might explain why he "gravitated to gang life," Judge Martin did not find them mitigating as to his criminal sophistication and the gravity and circumstances of the offense.

Dr. Malek opined that Stephen had been "clinically significantly impacted by adverse childhood experiences" to include that his mother suffered from mental illness and that his parents were "emotionally neglectful." But this conclusion, the court determined, was lacking in credibility and thus did not mitigate either the degree of Stephen's criminal sophistication or the severity of the gravity and circumstances of the murder. In particular, Judge Martin found no evidence corroborating the assertion that Stephen's mother suffered from a mental illness. Moreover, the judge pointed out, Stephen had "described his relationship with his parents as

17

supportive and he denied any abuse," which was consistent with his parents' testimony and the judge's review of the record.

The court also considered as a potential mitigant Stephen's mental state and his mental and emotional development at the time of the alleged murder, which occurred when he was 17 years old. In particular, Dr. Malek testified that Stephen's brain was likely still developing at the time of the offense. Judge Martin disagreed that this fact was significantly mitigating because the "offense was a willful premeditated shooting, it was not an impulsive act, and it was it was not in self-defense . . . and it was committed without provocation."

On appeal, Stephen claims the court's findings on these criteria must be reversed because Judge Martin gave "no weight to mitigating evidence that adult gang members pressured Stephen to be involved in the alleged shooting." But the court's order makes clear that it carefully considered this and all the other evidence Stephen presented, analyzed it in the context of the statutory factors, and concluded that it did overcome the circumstances that supported transfer of his case. The standard of review does not authorize us to reweigh the evidence to reach the outcome Stephen desires.

2. *Potential for Rehabilitation During Juvenile Court's Jurisdiction*

As noted, the juvenile court's jurisdiction over Stephen could end no later than his 25th birthday. (*J.S.*, *supra*, 105 Cal.App.5th at p. 213.) Given Stephen's age of 19 years and 10 months when the court decided the People's transfer motion, at most its jurisdiction would have lasted about five years. Judge Martin was required to consider "the minor's potential to grow and mature" during that time period. (§ 707(a)(3)(A)(ii).) The court's finding that this criterion, too, weighed in favor of transfer is supported by substantial evidence.

18

According to the transfer report, were Stephen to be committed to the YDA, he "would collaborate with a multi-disciplinary team . . . to develop an individualized rehabilitation plan . . . based on his assessed needs and strengths." This plan would likely include "cognitive behavioral therapy . . . , gang intervention, prosocial development, career technical education . . . , positive youth development classes, academic services, and care services." (Some capitalization omitted.) It could also incorporate "programs such as Thinking for Change, Moral Recognition Therapy . . . , Seeking Safety, Trauma Focused Cognitive Behavioral Therapy . . . and Aggression Replacement Training."

As for Stephen's likely success in such a commitment, the PO recognized that in the time Stephen had been detained under the current petition, he had "shown an effort to participate in programming," had earned his high school diploma, and had taken a few college courses. He was "been able to utilize healthy coping skills and seek support when needed." The transfer report also credited comments by Stephen's family members that he had shown "growth and maturity" because of the programming he had received while in custody. But at the same time, the PO—whose experience included supervising youths for gang offenses—observed that "Stephen continues to display gang entrenched violent and aggressive behavior despite the programming and services offered thus far."

The PO went on to state his belief that Stephen's "commit[ment] to maintaining his delinquent and gang lifestyle" would make it "difficult to rehabilitate him until he had a desire to remove himself entirely from the gang." In the officer's view, "[o]ne must consider Stephen's age as he has reached the age of maturity, yet he still engages in gang activities and violence despite the possibility of getting transferred to an age-appropriate

19

facility." "At this point," the officer continued, "it appears Stephen does not recognize the detrimental effects of his gang involvement. . . . As such it will take a considerable amount of time to help him change his outlook on gangs in order to remove himself from future risky endeavors." Based on "Stephen's current performance in custody and lack of implementation of skills learned through the intervention services provided to him while in custody thus far," the PO concluded, "it appears he will not have sufficient time in the juvenile court's jurisdiction to provide adequate rehabilitation."

Stephen's witnesses tried to paint a different picture of his progress while being detained and the likely outcome of the juvenile court's efforts to rehabilitate him. In summary, the percipient witnesses testified that he meaningfully participated in and benefitted from in-custody programming. His resilience coordinator also testified that Stephen felt bad for letting his family down, which supported an inference that they were invested in his well-being. The juvenile court mostly found these witnesses' testimony to be credible.

Yet Judge Martin did not assign it significant weight. The watch commander's testimony, in her view, also "highlighted the continued struggle of Stephen to moderate his behavior just over the last year in 2024, despite his consistent participation in therapy [and] programing . . . whether it was instigating peers, or disrespecting staff on his gang name, posturing, threatening to beat an officer's ass when being redirected, and then ultimately engaging in a fight." As for the remaining witnesses, the court recognized that Stephen had done well in the past while under supervision. But this recent history showed that whether in custody or not, he "picks and chooses when he wants to implement th[e] therapeutic skills that he is learning." Further, the court found concerning that his therapists and drug

20

counselor appeared to be relying mostly—if not solely—on Stephen's self-reporting of his therapeutic needs, which the judge inferred was not totally accurate.

On this point, as noted earlier, Stephen's description to Dr. Malek of his family dynamics differed from other evidence in the record, some of which he provided. Likewise, Stephen was inconsistent in reporting the extent of his drug use. In December 2021, he reported having used only marijuana and denied using other drugs. But in May 2022, in an attempt to avoid a harsh sentence under the drug petition, Stephen claimed the drugs police thought he was selling—cocaine and Xanax—were for personal use and that he had used them every day for "a couple of years" And in 2023, Stephen disclosed his use of certain drugs before December 2021 that he did not previously report and changed the frequency of his use of other drugs that he did report. In truth, Stephen tested positive for drugs on only the first two of the fifteen tests administered between July 2021 and October 2022—both times for marijuana—despite claiming to have taken other drugs during this time period. Even Malek conceded that she could not say whether Stephen had used all the drugs he claimed.

Dr. Malek concluded that Stephen could be rehabilitated by the juvenile court based in large measure on aspects of the percipient witnesses' testimony favorable to him and what programs would be available at the YDA. The court, however, was surprised by the fact that Malek had not assessed Stephen's risk for violence given that he had been charged with "one of the most serious and grave offenses that exists of which Stephen was allegedly intimately involved in by shooting the victim." Malek attempted to rationalize this omission by claiming that this assessment is usually

21

administered closer to the juvenile's release date, a response the judge believed reflected a bias toward Stephen.

"When considering the totality of the circumstances," Judge Martin explained, "it appears to this [c]ourt that Stephen has learned to perform well within the structure of the [c]ourt's rehabilitative custodial program in order to successfully complete the programs and return to the community." But Stephen "chose not to use those skills" on the date of the murder and he has struggled to use them while in custody for that offense. The court concluded that "considering the extensive prior intervention, Stephen's overall progress while on probation and in custody, his statement on more than one occasion that his behavior will be different, and then his immediate inability or lack of desire to sustain behavioral progress while detained and . . . even after a custodial release where he programmed well while in custody, the [c]ourt finds the People have proven by clear and convincing evidence that Stephen is not amenable to rehabilitation under the jurisdiction of the juvenile court." Accordingly, Judge Martin found this criterion supported transferring Stephen's case.

Stephen raises two challenges to this finding. First, he claims the People failed to present evidence of the programs he would require were he committed to the YDA because the PO's report was missing this information and the prosecutor called no expert to provide it. Stephen thus contends that the only evidence on this point is the unrebutted testimony of Dr. Malek who, he asserts, "identified specific therapies and programs at YDA that would meet Stephen's needs" and that he had "more than enough time for rehabilitation."

We read the record differently. Not only did the PO describe a likely plan for Stephen's rehabilitation while under juvenile jurisdiction, but in

22

certain respects he did so with *more* specificity than Dr. Malek.  With the caveat that the exact rehabilitation plan would be figured out upon Stephen's commitment, the PO identified particular therapies and named specific programs that would benefit him.  Malek, by contrast, merely concluded in the portion of the transcript cited by Stephen that after looking at a list of programs which *might* be available to him through the YDA, "I don't see any one that would not be helpful."  Although an expert's opinion on whether programs exist that would rehabilitate a minor is generally entitled to "great weight," that does not mean an expert's opinion *must* be credited.  (*Jimmy H.*, *supra*, 3 Cal.3d. at pp. 714–715.)  As the trier of fact, the juvenile court was free to discount Malek's conclusory opinion that programs offered by the YDA would successfully rehabilitate Stephen (*J.S., supra*, 105 Cal.App.5th at p. 212), and we must give due deference to that determination (*O.B., supra*, 9 Cal. 5th at p. 996).

Second, Stephen argues that the juvenile court misunderstood the length of time he could remain under its jurisdiction.  The PO stated that the court would be required by subdivisions (b)(1) and (e) section 875 to review Stephen's progress every six months and would be permitted to reduce his sentence by up to six months following each review.  As a result, the PO suggested that Stephen could be released within two years if the court imposed the minimum baseline term of four years.  (Cal. Rules of Court, rule 5.806(d).)  Although Judge Martin noted the officer's statement, she made clear she was assuming that the juvenile court's jurisdiction over this case could extend until Stephen turned 25 years old.  Thus, contrary to Stephen's assertion, the facts here are materially distinguishable from *Kevin P.*, *supra*, 57 Cal.App.5th at pages 198 through 199, where the juvenile court

23

erroneously treated the date of the minor's first parole hearing as the baseline for evaluating section 707's rehabilitation criteria.

Even considering the evidence of Stephen's progress in the programs and therapies in which he took part while in custody and assuming that the programs available at the YDA would likely be more intensive, there was substantial evidence for the juvenile court's finding that this criterion supported transferring his case. Indeed, because Stephen was not an accurate source about his own therapeutic and rehabilitative needs, the court was justified in giving less weight to the testimony of Stephen's counselors and Dr. Malek that he could be rehabilitated. The failure of the recent, prior interventions to instill lasting positive changes in Stephen could lead a reasonable trier of fact to conclude that his rehabilitative needs would not all be met while under the juvenile court's jurisdiction.

3. *Previous Delinquent History*

When evaluating the criterion of Stephen's earlier delinquent history, the juvenile court was required to "give weight to any relevant factor, including, but not limited to, the seriousness of the minor's previous delinquent history and the effect of the minor's family and community environment and childhood trauma on the minor's previous delinquent behavior." (§ 707(a)(3)(C)(ii).)

The juvenile court recited these factors and determined that this criterion favored transferring Stephen's case. The judge described Stephen's history with the juvenile justice system, determined that his behavior showed an unwillingness to take seriously the conditions of supervision that had been imposed, and noted that the seriousness of his misconduct had escalated from petty theft to much more serious charges despite multiple interventions. The court rejected Dr. Malek's opinion that Stephen's misconduct could be

traced to his parents' neglect and failure to supervise him, noting again that her testimony was inconsistent with other statements he had made about his family dynamics. While recognizing that Stephen's parents were not always around, the court described their extensive efforts to help him comply with the conditions of his supervision throughout the years.[13]

Stephen urges us to view the record differently on appeal. He asserts his "prior delinquent history indicates he *is amenable* to rehabilitation because it showed some fights and nonviolent incidents." (Italics added.) But he disregards the fact that many of those fights were gang related and that his past convictions include possessing two drugs (cocaine and Xanax) he was apparently trying to sell while armed with a loaded gun.[14] Stephen also tries to minimize the misconduct he admitted in the two prior wardship petitions, characterizing it as "nonviolent and therefore indicat[ive] of amenability," despite that he engaged in more serious misconduct at every step. Finally, he recounts the witness testimony he believes portrayed his parents as neglectful and unavailable, suggesting it mitigates his responsibility for his delinquent history.

Even were we to agree with Stephen's interpretation of this evidence, the result here would be no different because we may not simply substitute

[13] The parents moved Stephen from Mira Mesa to Poway, changed his school, disciplined him by taking away privileges, met with the PO even without him, made him go to work with his father as a way to keep him out of trouble, changed the locks to keep him from leaving without permission, increased their time with him, drug tested him, supported his participation in extracurricular activities, and encouraged him to pursue his dream of owning a jewelry business.

[14] We reject Stephen's suggestion that who started the gang-related fights is somehow determinative. The larger point is that Stephen's posturing as a gangmember showed his unwillingness to leave the gang life behind even at the risk of provoking physical confrontations from members of rival gangs.

our judgment for that of the juvenile court. We have no basis to conclude that a trier of fact would act outside the bounds of reason by finding Stephen's delinquent history supported transferring his case, considering the escalating nature of his misconduct, his disregard for the court's authority in supervising him, and his propensity for violence—at times either gang-related or directed toward figures of authority—while in custody for that misconduct. This finding, therefore, was supported by substantial evidence.

4. *Previous Rehabilitation*

When evaluating the juvenile court's earlier attempts to rehabilitate Stephen, Judge Martin was to consider "the adequacy of the services previously provided to address the minor's needs." (§ 707(a)(3)(D)(ii).) The court received evidence on this factor from both the PO and Dr. Malek and found that this criterion supported transferring Stephen's case to criminal court.

The transfer report described Stephen's contacts with the juvenile justice system and discussed his unwillingness to abide by conditions of supervision while out of custody. The PO noted that after Stephen was released from Urban Camp, he "did not take advantage of the services being offered to him" and "[o]nly after being detained for this matter did he decide to concentrate on services." "Despite the probation department and juvenile court's involvement along with interventions and services offered to him," the PO observed, "Stephen continued to participate in criminal and delinquent activities." He went on to describe that Stephen's criminal offenses "increased in severity over time [and] displayed extremely poor decision-making skills coupled with violent acts that displayed his commitment to his gang." Accordingly, the PO concluded that the programming offered to Stephen "was clearly not beneficial."

26

Dr. Malek agreed with this conclusion and blamed two causes: (1) Stephen "needed more services than he received" and (2) his parents "could not provide adequate supervision." She claimed that the supervision Stephen received while out of custody was inadequate because, for example, it was not tailored to his behavior of associating with gangs and abusing drugs. As for the programming he received while at Urban Camp, Malek thought the counselors needed more time to work with him and that they should have placed him in a residential drug treatment facility immediately upon his release rather than have him wait for a spot at the McAlister program.

The juvenile court was not persuaded by Dr. Malek's opinions. Judge Martin thoroughly described the history of previous attempts to rehabilitate Stephen, starting with his refusal to enter diversion to address his first petty theft through his detention under the current petition. According to the court, "Stephen was provided adequate services to address his needs and services at his request, even though he chose to be absent at times from home and to follow through at times with the services offered." And "[d]espite successfully completing a lengthy custodial commitment" to Urban Camp, "as well as engaging in all programming during that commit and acknowledging that he needed to do better, immediately upon his release from that commit, Stephen re-engaged in same and similar behavior." As to Malek's theory that Stephen's family did not provide adequate supervision, the court reiterated that Stephen's self-reporting of his family dynamics to her contradicted other evidence that was more credible. Accordingly, the court found this criterion supported transferring Stephen's case.

On appeal, Stephen argues that the juvenile court gave short shrift to Dr. Malek's opinions and did not appreciate the difficulties he had in

27

obtaining care. In particular, he focuses on the probation department's alleged mishandling of "a kid who was addicted to multiple substances" during and after his Urban Camp commitment. The record does not support the underlying premise that Stephen was actually addicted to multiple substances because, again, even Malek conceded that there was no proof that Stephen had used any drugs other than marijuana during the time period he was drug tested. But to the larger point, without any basis in the record to infer that the juvenile court ignored any of the evidence Stephen cites on his behalf, we may not second guess how the judge weighed it against the significant contrary evidence that he chose not to implement the skills he learned through the programming that he was offered. Accordingly, a reasonable trier of fact could have concluded that this criterion weighed in favor of transferring Stephen's case to criminal court.

5. *Clear and Convincing Evidence of Amenability to Rehabilitation*

We now turn to the juvenile court's ultimate conclusion that clear and convincing evidence established Stephen would not be amenable to rehabilitation before its jurisdiction would end. "[C]lear and convincing evidence demands a degree of certainty greater than that involved with the preponderance standard, but less than what is required by the standard of proof beyond a reasonable doubt." (*O.B.*, *supra*, 9 Cal.5th at p. 998.) The evidence must "leave no substantial doubt." (*In re Terry D.* (1978) 83 Cal.App.3d 890, 899.) The weight given to each of the criteria is within the court's discretion. (*Kevin P.*, *supra*, 57 Cal.App.5th at p. 186.)

We find that the record as a whole contains substantial evidence from which a reasonable trier of fact could make this finding. (*O.B.*, *supra*, 9 Cal.5th at p. 1005 ["when presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence,

28

the court must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof"].)  The increasing severity of Stephen's misconduct, his behaviors that consistently frustrated the probation department's and juvenile court's efforts to rehabilitate him, and his unwillingness to abandon the gang-life mentality even while in custody for murder—and presumably aware of the detrimental impact this behavior might have on his effort to oppose the People's transfer motion—sufficiently supports Judge Martin's conclusion that Stephen would not be amenable to rehabilitation within the jurisdiction of the juvenile court.

The recent decision from the First Appellate District in *O.F.* does not alter our view.  In that case, the 16 year old minor was charged with two counts of murder arising from a 2020 gang-related shooting that killed both occupants of a vehicle.  (*O.F., supra*, __ Cal.App.5th at pp. ___ ___ [2026 WL 708930, at pp. *2-*4].)  The minor's amenability hearing was conducted in 2022, prior to several significant statutory changes, only some of which the juvenile court was able to anticipate and attempt to apply.  (*Id.* at pp. ___ ___ [2026 WL 708930, at pp. *12, *15, *16].)  Concluding that these changes applied retroactively to the minor's case, the Court of Appeal reversed and remanded for a new amenability hearing consistent with all aspects of the current law.  (*Id.* at p. ___ [2026 WL 708930, at p. *1].)

Significantly, the amenability hearing in this case took place in 2025, some time after all the statutory changes highlighted in *O.F.* had become effective.  Indeed, Judge Martin began the hearing by articulating the statutory burdens, standards and criteria she was obligated to apply, including the recent changes referenced in *O.F.*  As a result, the primary

29

problem with the juvenile court's order in *O.F.*—application of an outdated legal standard—is simply not an issue in this case.

In contrast, the principal issue before us is the sufficiency of the evidence to support Judge Martin's conclusion that Stephen is not amenable to rehabilitation within the juvenile court's jurisdiction, and this finding was based on her analysis of all five criteria in section 707(a)(3). The appellate court in *O.F.* analyzed only one of those five criteria in terms of sufficiency of the evidence—what it termed the "second criterion" inquiring "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction." (§ 707(a)(3)(B)(i).) Because "all the testimony at the amenability hearing, including that of the probation officers, was that there was sufficient time for O.F. to be rehabilitated" (*O.F., supra,* __ Cal.App.5th at p. ___ [2026 WL 708930, at p. *17]), the Court of Appeal concluded that the juvenile court's contrary determination was not supported by substantial evidence. (*Id.* at p. ___ [2026 WL 708930, at p. *19].)

In Stephen's case, as we have noted, there was no unanimity in the testimony as to the amount of time that would be necessary for successful rehabilitation. Unlike as to *O.F.*, the evidence here did not "uniformly suggest" that Stephen "has the potential to overcome his gang roots before jurisdiction expires." (*O.F., supra*, __ Cal.App.5th at p. ___ [2026 WL 708930, at *18].) And particularly because it arises in a different procedural context, *O.F.* does not compel a different result when analyzing the sufficiency of the evidence to support the juvenile court's findings.

Finally, Stephen argues reversal is required because the juvenile court focused too heavily on the severity of the alleged crime at the expense of whether he was amenable to rehabilitation. We cannot accept this argument because the court stated at the outset that "[t]he sole issue to be decided is

30

whether Stephen is amenable to rehabilitation while under the jurisdiction of the juvenile court." It further noted that the facts of the offense are relevant only "as [they] relate to the transfer criteria that this court needs to consider." Both of these legal principles are correct, and both were faithfully applied by the juvenile court in reaching its conclusion.

## DISPOSITION

The order is affirmed.

DATO, J.

WE CONCUR:

McCONNELL, P. J.

KELETY, J.

31